UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

TERESA HARWOOD,

     Plaintiff,

v.

NORTH AMERICAN BANCARD LLC,
and MARC GARDNER, jointly and severally,

     Defendants.

Case No. 18-cv-12567

Hon. Paul D. Borman

Magistrate Judge
Elizabeth A. Stafford

---

Jennifer L. Lord (P46912)
Robert W. Palmer (P31704)
Pitt McGehee Palmer
  & Rivers, PC
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan  48067
jlord@pittlawpc.com
rpalmer@pittlawpc.com

Elizabeth P. Hardy (P37426)
Thomas J. Davis (P78626)
Sarah L. Nirenberg (P77560)
KIENBAUM HARDY VIVIANO
PELTON & FORREST P.L.C.
Attorneys for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com
snirenberg@khvpf.com

---

**Defendants' Motion for Summary Judgment**

Defendants North American Bancard LLC and Marc Gardner move this Court, under Rule 56, for entry of summary judgment. In support of the motion, Defendants state:

1.      Plaintiff filed her complaint on August 17, 2018. R. 1.

2.      For the reasons set forth in the accompanying brief, there is no genuine dispute as to any material fact arising out of the claims stated in Plaintiff's Complaint, and Defendants are entitled to judgment as a matter of law.

3.      On November 15, 2019, counsel for Defendants explained the nature of the motion and relief it would be seeking, but concurrence was not obtained, necessitating the filing of this motion.

                    KIENBAUM HARDY VIVIANO
                     PELTON & FORREST, P.L.C.


                    By: */s/ Elizabeth Hardy*
                        Elizabeth Hardy (P37426)
                        Thomas J. Davis (P78626)
                        Sarah L. Nirenberg (P77560)
                        Attorney for Defendants
                    280 N. Old Woodward Ave., Suite 400
                    Birmingham, MI 48009
                    (248) 645-0000
                    ehardy@khvpf.com
                    tdavis@khvpf.com
Dated: November 21, 2019    snirenberg@khvpf.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

TERESA HARWOOD,

     Plaintiff,                           Case No. 18-cv-12567

v.                                     Hon. Paul D. Borman

NORTH AMERICAN BANCARD LLC,     Magistrate Judge
and MARC GARDNER, jointly and severally,     Elizabeth A. Stafford

     Defendants.

---

Jennifer L. Lord (P46912)       Elizabeth P. Hardy (P37426)
Robert W. Palmer (P31704)     Thomas J. Davis (P78626)
Pitt McGehee Palmer           Sarah L. Nirenberg (P77560)
  & Rivers, PC              KIENBAUM HARDY VIVIANO
Attorneys for Plaintiff        PELTON & FORREST P.L.C.
117 W. Fourth Street, Suite 200    Attorneys for Defendant
Royal Oak, Michigan  48067     280 N. Old Woodward Ave., Suite 400
jlord@pittlawpc.com          Birmingham, MI  48009
rpalmer@pittlawpc.com       (248) 645-0000
                          ehardy@khvpf.com
                          tdavis@khvpf.com
                          snirenberg@khvpf.com

---

**Defendants' Brief in Support of Motion for Summary Judgment**

**Statement of the Issues Presented**

1.  Plaintiff Harwood alleges she was terminated as Defendant North American Bancard's Chief Operating Officer because of her sex. But Harwood admits that she and CEO Gardner had long clashed over her efforts to change his management style, and that Gardner had lost patience with their conflict in the months leading to the termination. Given that Harwood admits that Gardner's stated reason for terminating her is true, should the Court dismiss Harwood's disparate-treatment termination claims?

2.  Harwood alleges "sex or gender" harassment. Her claims of facially-sexual misconduct are outside the relevant statute of limitations, and were isolated and few in number. She has no proof that the facially-neutral conduct she complains of occurred because of her gender. And that facially-neutral conduct, all business-related disagreements, is not the sort of conduct that can establish an "abusive" workplace as contemplated by the law. Should the Court dismiss the hostile work environment claims?

3.  Harwood also alleges retaliatory termination. But her termination took place four months after the last protected activity, too long for temporal proximity alone to establish a *prima facie* inference of causation. Her other evidence of causation is social exclusion and workplace disagreements that had been occurring even before the protected activity. And as stated above, Harwood has admitted that Gardner's stated reason for terminating her is true. Should the Court dismiss the retaliation claims?

4.  Title VII allows liability only against employers, and not against individual supervisors. Plaintiff Harwood's Complaint names CEO Mark Gardner as a defendant. Because Gardner cannot be held personally liable under Title VII, should the Court grant summary judgment as to Gardner on the Title VII claims?

## Table of Contents

Statement of the Issues Presented ............................................................. i

Table of Contents ................................................................................... ii

Controlling Authorities ........................................................................ iv

Introduction ...........................................................................................1

Factual Background ...............................................................................2

    A.    Garner founds NAB and runs it with a hands-on style. ..........................2

    B.    Gardner hires Harwood—whose background was in large payment companies—as his COO in 2012. ............................4

    C.    Harwood immediately tries to change NAB's "culture." .......................5

    D.    Harwood clashes with Gardner over management style .........................6

    E.    Harwood recognizes, by June 2017, that Gardner is not interested in changing his style. ....................................7

    F.    In August 2017, Harwood tells dBusiness Magazine that her recent "communication snags" may "stem from her being female." ......................................................10

    G.    On February 20, 2018, Gardner terminates Harwood and does not replace her .............................................12

    H.    Harwood files an EEOC charge and this lawsuit .................................13

Argument ..............................................................................................14

I.    Harwood's disparate-treatment gender claim fails as a matter of law. ..........14

    A.    Harwood has no direct evidence of gender discrimination. .................15

    B.    Harwood cannot establish a prima facie case of gender discrimination and cannot show that the reason for her termination was pretext. ........................................16

II.     Harwood does not identify alleged conduct that would support a Title VII or
        ELCRA harassment claim. ...............................................................................17

        A.      Harwood cannot make out a timely, actionable hostile
                environment claim based on "sexual" harassment. .............................18

        B.      Harwood cannot show that her disputes with Gardner were
                because of gender, and in any event she cannot establish a
                "hostile" environment. ........................................................................20

III.    Harwood's retaliation claims fail as a matter of law.....................................24

IV.     Harwood's Title VII claims against Gardner should be dismissed...............25

Conclusion ................................................................................................................25

# Controlling Authorities

## Cases

*Ackerman v. Diamond Shamrock Corp.*,
   670 F.2d 66 (6th Cir. 1982) ................................................................. 16

*Alexander v. CareSource*,
   576 F.3d 551 (6th Cir. 2009) ............................................................... 15

*Barnes v. GenCorp Inc.*,
   896 F.2d 1457 (6th Cir. 1990) ............................................................. 16

*Black v. Zaring Homes, Inc.*,
   104 F.3d 822 (6th Cir.1997) ................................................................ 20

*Blizzard v. Marion Tech. Coll.*,
   698 F.3d 275 (6th Cir. 2012) ............................................................... 25

*Buhrmaster v. Overnite Transp. Co.*,
   61 F.3d 461 (6th Cir. 1995) ................................................................. 17

*Clark v. DaimlerChrysler Corp.*,
   268 Mich. App. 138 (2005) ................................................................. 18

*Clay v. United Parcel Serv., Inc.*,
   501 F.3d 695 (6th Cir. 2007) ............................................................... 20

Daniels v. Pike County Commissioners
   706 F. App'x 281 (6th Cir. 2017) ......................................................... 23

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) ................................................................. 17, 22

*Gwen v. Regional Transit Auth.*,
   7 Fed. App'x 496 (6th Cir. 2001) ......................................................... 20

*Harris v. Forklift Sys.*,
   510 U.S. 17 (1993) .............................................................................. 17

*Haynie v. State*,
   664 N.W.2d 129 (Mich. 2003) ............................................................. 18

*Hazle v. Ford Motor Co.*,
   628 N.W.2d 515 (2001) ....................................................................................15

*Hecht v Nat'l Heritage Acads., Inc*,
   499 Mich. 586 (2016) ......................................................................................15

*Johnson v. Bolden*,
   699 F. Supp. 2d 295 (D.D.C. 2010) ................................................................23

*Khamati v. Sec'y of Dep't of the Treasury*,
   557 F. App'x 434 (6th Cir. 2014)......................................................................22

*Kocsis v. Multi–Care Mgmt. Inc.*,
   97 F.3d 876 (6th Cir.1996) ..............................................................................14

*Land v. S. States Coop., Inc.*,
   740 F. App'x 845 (6th Cir. 2018) .....................................................................16

*Magee v. DaimlerChrysler Corp.*,
   472 Mich. 108 (2005 .......................................................................................21

*Morris v. Oldham County Fiscal Ct.*,
   201 F.3d 784 (6th Cir. 2000) .................................................................... 20, 22

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ..........................................................................................19

*Peeples v. City of Detroit*,
   891 F.3d 622 (6th Cir. 2018) ...........................................................................15

*Peltier v. United States*,
   388 F.3d 984 (6th Cir. 2004) ...........................................................................16

*Redlin v. Grosse Pointe Pub. Sch. Sys.*,
   921 F.3d 599 (6th Cir. 2019)............................................................................24

*Rogers v. Henry Ford Health Sys.*,
   897 F.3d 763 (6th Cir. 2018)............................................................................24

*T.C. v. Metro. Gov't of Nashville*,
   378 F. Supp. 3d 651 (M.D. Tenn. 2019) ..........................................................17

*Terry v. Memphis Hous. Auth.*,
   422 F. Supp. 2d 917 (W.D. Tenn. 2006) ............................................................ 23

*Wathen v. Gen. Elec. Co.*,
   115 F.3d 400 (6th Cir. 1997) ............................................................................ 25

*Williams v. Gen. Motors Corp.*,
   187 F.3d 553 (6th Cir. 1999) ............................................................................ 20

## Introduction

North American Bancard, LLC ("NAB"), an independent sales organization in the credit card processing services industry, is an entrepreneurial operation, founded by its CEO Marc Gardner in 1992. Under Gardner's leadership, NAB has grown from himself to over 1,200 employees. Gardner has always had a hands-on style, and while some might consider him a micromanager, he wants to be directly involved with his employees and with NAB issues at all levels of his organization, and not just within his executive team. This is how Gardner has historically operated NAB, and how he expects to continue operating it.

In 2012, Gardner hired Plaintiff Terri Harwood as NAB's new Chief Operating Officer. Harwood came from a large corporate background, and was trained in a managerial style incompatible with Gardner's hands-on approach. She knew this going in, but wanted to change Gardner and brought in corporate consultants to try to do so. Among other things, Harwood believed that Gardner— again, *the CEO and founder*—was not entitled to speak with his own employees or handle issues directly, but instead had to route all such requests through her, and to refrain from any business discussions, even ad hoc discussions at social functions, if she wasn't there. In her mind, Gardner was not allowed to be Gardner.

Harwood, at deposition, admitted "it's his company" and "his prerogative" to run things his way. But that was certainly not how she behaved as COO. She was

downright intolerant of Gardner, lecturing him about his "meddling" and refusal to "stay in his lane" when it came to operations, which she felt was her own fiefdom. And even after she *knew* that Gardner had lost interest in her efforts to re-make him, she kept up her crusade to the exclusion of more critical duties, including going on vacation and missing an important call during NAB's 2017 acquisition of a rival company. After numerous other executives, and even one of Harwood's own hired consultants, complained that Harwood's rigid managerial style had created a toxic environment, Gardner let her go.

Now, Harwood has filed this suit, in effect demanding that this Court hold that *her* preferred executive management model is the "correct" one, *and* that Gardner's decision to keep engaging in his "micro-managerial" hands-on style was gender discrimination. She tries to hide her objective of winning this quintessential issue of business judgment by peppering her complaint with a handful of incidents over the years that she felt "objectified" women, none of which was directed at her, and none of which would support a sexual harassment claim anyway. Gardner hired Harwood, and he terminated her. He had no gender bias. This is a business dispute, not a legitimate discrimination or retaliation suit. Summary judgment is appropriate.

## Factual Background

**A.      Garner founds NAB and runs it with a hands-on style.** In 1992, Marc Gardner left his job in the credit card processing industry in order to start NAB.

Ex. A, Gardner Dep. 10:17-11:19. NAB, among other things, assists merchants in processing payment card transactions. Ex. B, Gardner Decl. ¶ 3. Gardner, who has always been NAB's CEO, built NAB from the ground up, with a goal of improving upon industry practices that he found suboptimal. Ex. A at 11:3-11. He has worked every job within NAB, and knows how he wants NAB run. *Id.* & 90:18-91:6.

Gardner's management style has always been an entrepreneurial, "hands-on" approach, and he involves himself in many different aspects of the business at a detailed level. *Id.* at 88:22-89:5; Ex. C, Parkinson Dep. 44:4-14. For example, Gardner believes in getting direct, unfiltered feedback from front-line employees doing specific work, and would often articulate goals directly to employees below the executive-suite level. Ex. A at 90:9-91:4; Ex. B ¶ 4. Gardner also works at a fast pace, shifting topics during meetings—asking whomever he is with to do something, or speak to someone, even if it is outside that person's department or chain-of-command. Ex. B ¶ 5; Ex. D, Haggarty Dep. 89:10-12; Ex. E, Kellogg Dep. 25:10-21. It is also not uncommon for him to cancel meetings at the last minute if higher priority items demand his attention. Ex. D at 86:4-8. Gardner contrasts his style with the management style in larger corporations, where executives and managers stick to specific roles. Ex. A at 88:22-89:5, 90:9-91:6; Ex. B ¶ 10.

Since its founding, NAB has become the sixth largest non-bank merchant acquirer in North America, employing over 1,200 people. Ex. B ¶ 2. Gardner prefers

to run his business his way, and does not expect that he will change his style so long as he owns NAB. Ex. A, Gardner Dep. 131:3-7; Ex. B, Gardner Decl. ¶ 7.

**B.    Gardner hires Harwood—whose background was in large payment companies—as his COO in 2012.** In 2012, NAB terminated its male COO. Ex. A at 22:11-21; Ex. B ¶ 8. NAB retained a consultant to fill the job, who recommended Harwood. Ex. A at 20:14-22; Ex. B ¶ 9.  Harwood—who had a high school education and one semester of college—obtained her business training on the job in large, publicly-traded companies, and through management courses with groups like Franklin Covey. Ex. F, Pl's Dep. 20:3-28:1, 66:4-11, 78:10-79:9 & Dep. Ex. 2 (Resume); Ex. B ¶¶ 9-10. At the time, Harwood worked for Global Payments, Inc., a vendor of NAB's. Ex. B ¶ 9 & Ex. F at 66:7-9. Gardner knew Harwood through NAB's relationship with Global, and agreed to consider her. Ex. A at 19:4-20:9. Harwood interviewed with Gardner and members of NAB's leadership team. *Id.* at 24:5-15. Gardner made the final decision to hire her as NAB's COO. *Id.*

Harwood knew about Gardner's operating style before she was hired, and thought he was "demanding" and an "egomaniac" with a "short temper." Ex. F at 88:11-90:1. But Harwood wanted the job, thinking she would have more opportunity to influence the workings of a smaller organization like NAB. *Id.* at 78:21-79:5. This included "guid[ing]" and "coach[ing]" Gardner using her "industry experience" and "discipline associated with working for a large publicly traded company." *Id.* at

-4-

85:10-14, 90:14-20. Harwood also thought Gardner might ultimately sell NAB, and her "end game" was to financially benefit from a sale. *Id.* at 77:14-18, 79:17-25.

Upon her hire, Harwood agreed that "any… lawsuit arising out of my employment with" NAB "must be filed no more than six (6) months after the date of the employment action that is the subject of the… lawsuit." Ex. O, ¶ 3.a.

**C.    Harwood immediately tries to change NAB's "culture."** Upon starting her job, Harwood said she saw problems with the firm's "culture" and Gardner's management style, and sought to change them. Ex. F, Pl's Dep. 320:20-324:1. Among her complaints was "meetings that were attended by a variety of levels throughout the organization" rather than just executive leadership, where Gardner and others would swear or raise their voices. *Id.* at 322. Harwood's plan to "address the culture issue" and "bring in some professional development" was to hire Franklin Covey, with whom she worked at Global, to teach their corporate coaching methods. *Id.* at 109:15-111:1, 324:1-13 & Dep. Ex. 2, p. 4.

Gardner participated for years in counseling sessions with Franklin Covey agent Gary Jewkes. Ex. A, Gardner Dep. 94:8-25. But he continued to hold a "different philosophical management approach and strategy" from Harwood. *Id.* at 105:12-106:2. He saw Harwood as espousing a large-firm philosophy where employees stayed in specific roles, while he preferred a collaborative approach where "people [can] speak to each other" regardless of specific role or level. *Id.*

**D.** **Harwood clashes with Gardner over management style.** Throughout her time at NAB, Harwood openly voiced her displeasure with Gardner's style when it differed from her own. She viewed Gardner as "meddling" in his own company and "micromanaging" by "[s]pending time on non-important ideas and priorities" and "drifting into" other people's lanes. Ex. H, Records Decl. ¶ 3.a. She believed Gardner's style was to "micromanage everybody" which wasn't "the most beneficial use" of his or other executive's time. *Id.* & Ex. F, Pl's Dep. 125:2-128:1.

Harwood would also cite Franklin Covey or similar materials in discouraging Gardner's direct involvement with his team. For example, in August 2014, Gardner emailed with outside salesperson Brian Roth, with whom he had a long relationship. Ex. I, Pl's Production p. 217-18; Ex. F, Pl's Dep. 546:16-21. Harwood told Gardner to "stop being sales support for Brian" and to "Remember the Trust Behavior of Loyalty." Ex. I, p. 217. In September 2016, she told Gardner to "not copy/reply to Brian" in emails, because "capable people" should handle that instead. *Id.* p. 373. And in January 2017, Harwood sent then-Senior Vice President for Sales Justin Muntean an email instructing him not to respond to Gardner's meeting notice. Ex. H, Records Decl. ¶ 3.b. She also "recommended" that Gardner not meet with Muntean, and sent Gardner an excerpt from a business management book implying it wasn't his "role" to meet with him. *Id.* Gardner responded that it was his "intention and desire to be a part of the sales strategy and to have greater visibility to the overall

sales performance." *Id.* She likewise quoted Franklin Covey materials in meetings with colleagues, and implied they should do the same. Ex. J, Haggarty Decl. ¶ 4.

Harwood also disapproved of Gardner asking employees questions not specifically identified as meeting topics, and being critical of employees who did not have answers or details for him. Ex. F, Pl's Dep. 118:14-122:4; Ex. I, Pl's Production pp. 368-370. She also disliked Gardner addressing issues with whoever was before him, rather than going to the person in charge of the subject, or to Harwood herself. Ex. I pp. 193-97; Ex. F at 128:21-131:1, 161:4-8, 182:8-15, 185:23-90:1. Ultimately, Gardner told Harwood that his desire to directly interface with his team and offer solutions was irreconcilable with Harwood's desire to keep Gardner's discussions confined to the executive suite, unless she approved otherwise. Ex. A, Gardner Dep. 124:19-125:20. Harwood's response was that Gardner should change. *Id.*

**E.    Harwood recognizes, by June 2017, that Gardner is not interested in changing his style.** According to Harwood, Gardner made changes that would "ebb and flow." Ex. F at 154:18-156:1. CFO Kirk Haggarty, who initially supported Harwood's efforts to soften Gardner's aggressive style and reduce micromanaging, decided in late 2016 that Gardner was not going to change and focused his energies elsewhere. *Id*. He saw Gardner "lack of receptiveness" and frustration with Harwood's attempts to "make him a different person and be his life and morals

coach." Ex. D, Haggarty Dep. 103:10-15. And by mid-2017, Harwood knew Gardner's tolerance for their conflict was waning. Ex. F, Pl's Dep. 156:15-157:4.

Harwood said Gardner "stopped making progress" towards adopting her changes in connection with NAB's half-billion-dollar acquisition of a California competitor called Total Merchant Services, Inc.—which was finalized in June 2017. *Id*. And it was during the TMS deal that Gardner concluded that the stark difference and mismatch between his priorities and Harwood's were having a material impact on items he believed critical. Ex. B, Gardner Decl. ¶ 11. To Gardner, the TMS acquisition was a critical moment in the history of NAB, the largest deal NAB had ever worked on. *Id.*; Ex. F at 459:14-460:1. Gardner, Haggarty, Vice President of HR Julia Kellogg, and others worked significant hours, including nights and weekends, on the acquisition. Ex. B ¶ 11. But while Gardner was trying to grow NAB, Harwood remained focused on changing him and NAB's "culture." *Id.* Gardner felt that Harwood was not demonstrating sufficient engagement on critical issues as a top-tier executive must. *Id.* For instance, Harwood took vacation time right as the TMS deal was about to close, and missed a critical call related to the closing she was asked to participate in. *Id.*; Ex. F at 467:23-473:1; Ex. D at 108:24-109:23. And Gardner expressed his unhappiness to Harwood. Ex. F at 473:4-13.

While in California after the acquisition, Gardner learned of another incident that he felt reflected the mismatch between her focus and NAB's goal of integrating

TMS into NAB. Ex. A, Gardner Dep. 119:9-21. After the acquisition, TMS's former COO Mike Vaughn became head of NAB's California office. Ex. A at 120:5-122:2. At a lunch with Gardner, Vaughn reported that Harwood—who was not in California—had instructed him not to talk business with Gardner because she would not be present, and insinuated consequences for non-compliance. *Id.* This was troubling to Gardner, who wanted to speak and work directly with Vaughn in the critical task of integrating TMS into NAB. Ex. B, Gardner Decl. ¶ 12. Gardner felt that Harwood was undermining him and working around his collaborative style by making Vaughn fearful of talking with him. Ex. A at 119:9-21; Ex. B ¶¶ 12-13. Gardner had no reason to doubt Vaughn, as his concerns were consistent with Harwood's prior actions.[1] Ex. A at 124:6-12; Ex. B ¶ 13.

Other issues also arose around this time. Ex. B ¶ 14. There were problems with excessive hold times in the call center throughout 2017. Ex. F at 270:11-24; Ex. B ¶ 15. Harwood had hired Scott Fessler to run the center, and thought he was "stellar." Ex. F at 262:8-10, 269:19-20. When Gardner told her that Fessler had to fix the problem or be fired, Harwood complained that Gardner was telling her who could be on her team.  Ex. A at 126:19-127:23; Ex. B ¶ 15. Harwood couldn't deny

---

[1]Other diligence issues included Harwood's failure to deliver on her assessment that she could reduce headcount by 168 after the TMS/NAB merger, instead only reducing a "handful" of positions. *Id.*; Ex. F at 474:25-477:6. She tried to blame Gardner and others at first, but agreed that she remained responsible for not reducing headcount. Ex. F at 475:18-479:9.

this conversation. Ex. F, Pl's Dep. 274:2-9. And Harwood's subordinate Geoff Stocki's failure to timely implement telephone verification, and delays in underwriting new merchants. Ex. B ¶ 16. Harwood claimed she knew nothing of the former concern, and that there were only "occasional" underwriting delays. Ex. F at 278:12-279:1, 364:1-366:4. After Harwood left, Jay Nadarajah took lead on both issues, implementing phone verification and reducing underwriting time. Ex. B ¶ 16.

Gardner finally heard from multiple people in the latter half of 2017 about Harwood's toxic conduct. Kellogg and Haggarty both told Gardner that they opposed the non-collaborative, "stay in your lane" style that Harwood wanted. Ex. A at 116:12-22, 118:5-119:2; Ex. B ¶ 18; Ex. G, Kellogg Decl. ¶¶ 3, 5. Haggarty felt negatively impacted by Harwood's approach, and wouldn't be at NAB long-term if the friction continued, as he couldn't collaborate with, or even talk to, Harwood's subordinates unless she preapproved. Ex. D, Haggarty Dep. 102:19-103:15, 107:19-22, 114:6-20. By contrast, Haggarty, Kellogg, and CIO Jim Parkinson all got along. Ex. J, Haggarty Decl. ¶ 5; Ex. G ¶ 4. And NAB's Franklin Covey representative Gary Jewkes told him that Harwood was creating disharmony with the executive team, and that she likely wouldn't change. Ex. A at 134:1-136:21; Ex. B ¶ 18.

**F.    In August 2017, Harwood tells dBusiness Magazine that her recent "communication snags" may "stem from her being female."** On August 3, 2017, dBusiness Magazine published an article called "2017 Powered by Women" that

-10-

profiled Harwood. Ex. K, dBusiness Article. In her profile, Harwood discussed her "instrumental" role in bringing Franklin Covey to NAB and providing NAB's leaders with "professional development training." *Id.* Then, without naming Gardner, Harwood identified one of her ongoing managerial disputes—consulting others for "items that are in my span of control"—and suggested that it "may stem from her being female." *Id.* Harwood testified that Gardner said nothing negative about the article, and "didn't know" whether there was reason to think that Gardner expressed concern about the article to anyone. Ex. F, Pl's Dep. 416:13-417:1.

On November 15, 2017, Harwood emailed Kellogg stating that NAB's "culture" had "eroded" over the prior year, and that she had "personal[ly] face[d] harassment, abuse, and bullying comments." Ex. F, Pl's Dep. 228:3-12; Ex. E, Kellogg Dep. Ex. 6. The email did not say who "abused" her, and did not say what the "harassment" related to—whether she meant sexual, gender-based, or because of friction between colleagues due to differences in management style. *Id.*

Then, on November 27, 2017, Harwood confronted Gardner about a meeting he had asked her to attend with an outsourcing consultant two weeks earlier. Ex. F, Pl's Dep. 230:13-231:1. The meeting related to potentially closing NAB's deployment department, where Harwood's sons worked. *Id.* & 437:8-438:9. Harwood complained that she should have participated earlier in the outsourcing discussions that might have led to her own sons being laid off. *See id.* at 231:4-

-11-

231:25. Harwood testified that Gardner said, "if you weren't a mom, you could have," to which she asked, "if I was a dad it would be different?" *Id.* at 232:1-5. Gardner allegedly said, "maybe." *Id.* Harwood then allegedly told Gardner he was "treating me differently than my male counterparts." *Id.* at 232:6-11. Gardner denies making these statements, but told Harwood that she was not included because of her conflict of interest due to her sons' positions. Ex. B ¶ 17. Further, Gardner felt Harwood's inability to recognize her conflict showed a lack of judgment.[2] *Id.*

On December 8, 2017, Kellogg wrote Harwood asking for additional information on her November 15 claims. Ex. E, Kellogg Dep. Ex. 6. Harwood said she would "get the details to" Kellogg, but never responded in writing. *Id.* She claims she told Kellogg about the November 27 incident verbally; Kellogg does not recall such a talk. Ex. F, Pl's Dep. 230:1-232:1; Ex. E, Kellogg Dep. 78:6-24, 102:3-8.

**G.    On February 20, 2018, Gardner terminates Harwood and does not replace her.** Harwood continued to press Gardner on his management style, sending a December 17, 2017 email spelling out their philosophical differences, stating, *e.g.*, that Gardner had "no clear vision," that there was "poor team chemistry," that executives did not have clear "roles and responsibilities," and that roles overlapped.

---

[2]NAB policy states that "Relatives may not directly or indirectly supervise one another in the same department…." Ex. O ¶ 3.b. Harwood admitted that having her sons in her reporting chain "could be construed" as violating this policy, and that she did not tell Gardner when her sons were hired. Ex. F at 442:7-445:1.

Ex. F, Pl's Dep. Ex. 8. This email did not allege gender-based harassment or disparate treatment. *See id.* Harwood's email acknowledged "poor team chemistry" and referenced the "executive team members who actively dislike each other." *Id.*

In large part due to the incredible friction Gardner felt Harwood was creating with her continued efforts to force him and his colleagues to adopt her "stay in your lane," non-collaborative management style—and his view that her performance was affected—Gardner decided to terminate Harwood. Ex. A, Gardner Dep. 115:25-116:22, 126:7-10; Ex. B ¶ 19. The termination took place on February 20, 2018 at Gardner's direction by then-outside counsel David Greenberg. Ex. B, Gardner Decl. ¶ 19; Ex. L, Greenberg Dep. 44:3, 19-21. Harwood was not replaced, and her duties were split among a number of existing employees. Ex. A at 108:14-111:8.

**H.     Harwood files an EEOC charge and this lawsuit.** On June 28, 2018, Harwood filed an EEOC charge, claiming sex discrimination and retaliation—and asked the EEOC to issue a right-to-sue letter because "I agreed to bring any claim against [NAB] within six months after termination of employment." Ex. M, EEOC charge; Ex. N, Email to EEOC. The EEOC issued the right-to-sue letter a few weeks later, and on August 17, 2018, Harwood filed this lawsuit. R. 1 & 1-2.

In her Complaint, Harwood referenced her issues with Gardner's management style, *e.g.*, R. 1, ¶ 30, and claimed they were sex *or* gender harassment and retaliation. *Id.* ¶¶ 31-55. She interspersed the complaint with allegations of Gardner

"sexualizing" other women, all from 2014. *Id.* ¶¶ 32-38. The first was that, in April 2014, NAB hired models as presenters at a Las Vegas industry event that Harwood felt were too scantily dressed. R. 1, ¶¶ 33-35, Ex. F, Pl's Dep. 160:13-19, 167:6-168:14. The second was a December 2014 photo taken at a holiday party, which the Complaint implied showed Gardner engaging in "inappropriate sexual behavior" with two women, R. 1 ¶¶ 36-37; but at deposition, Harwood said it was a photo she speculated showed Gardner jokingly *simulating* sexual behavior with two non-employees.[3] Ex. F at 173:1-176:11. The third is Gardner and some co-workers going to a strip club after the December 2014 holiday party. R. 1 ¶ 38; Ex. F at 176:14-17.

## Argument

### I.   Harwood's disparate-treatment gender claim fails as a matter of law.

Absent direct evidence of discrimination, Title VII and ELCRA claims proceed under the *McDonnell Douglas* method of proof. The plaintiff must first establish a *prima facie* case by showing, among other things, that she suffered an "adverse employment action," such as termination or significantly diminished material responsibilities. *Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir.1996). If she does, the defendant must then give a legitimate, non-discriminatory reason for the employment decision, after which the burden shifts back to the plaintiff to show that the proffered reason is false and pretext for unlawful

---

[3]Gardner explained that the picture depicts no such thing. Ex. A at 49:25-51:16.

-14-

discrimination. *Alexander v. CareSource*, 576 F.3d 551, 559 (6th Cir. 2009) (Title VII); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (2001) (ELCRA).

## A.     Harwood has no direct evidence of gender discrimination.

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Peeples v. City of Detroit*, 891 F.3d 622, 633 (6th Cir. 2018). "Inferences are not permitted" in a claim of direct evidence. *Id.* The "hallmark" of direct evidence is "a statement made by a decision-maker, to the plaintiff, at the meeting in which the plaintiff suffered the adverse employment action, and evincing a causal nexus." *Hecht v Nat'l Heritage Acads., Inc*, 499 Mich. 586, 608 & n. 34 (2016).

Here, there is no direct evidence that Harwood was terminated because of gender discrimination. She alleges only one comment by Gardner that even remotely has a gendered connotation: that she was not involved in the November 2017 outsourcing meeting because she was a "mom." *Supra* p. 12. But even if one ignored the context that "mom" referred to Harwood's family relationship at issue and not Harwood's gender *per se*, Harwood was not terminated as a part of that discussion, and she does not allege any direct comments of discrimination made at the time of her February 2018 termination. At best, she wants this court to *infer* gender discrimination, and that means the comment is not direct evidence.

**B.     Harwood cannot establish a prima facie case of gender discrimination and cannot show that the reason for her termination was pretext.**

Harwood likewise cannot prove gender discrimination through circumstantial evidence. At the outset, she cannot even establish a *prima facie* case, which requires Harwood to show that she was "replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). Harwood was not replaced as COO; rather, her duties were reassigned to several existing employees. *Supra* p. 13. A person is not replaced when "another employee is assigned to perform the plaintiff's duties in addition to other duties" or the duties are "redistributed among other existing employees already performing related work." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Further, she cannot show any person "similarly situated" to her that was treated more favorably; none of Harwood's fellow executives had similar clashes with Gardner over management style.

Nor can Harwood show that Gardner's stated reasons for terminating her were false and pretextual. It is well established that "[a] mere conflict in personality and managerial style is a valid reason for discharge by an employer." *Land v. S. States Coop., Inc.*, 740 F. App'x 845, 849 (6th Cir. 2018) (citing *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982)). And there is no dispute that Harwood and Gardner's managerial style and personalities clashed. Indeed, Harwood admits that Gardner's tolerance for their ongoing battles over how he was

allowed to run his business was exhausted by June 2017, yet she undisputedly continued to lecture and scold Gardner about his priorities and alleged deficiencies. *See supra* pp. 12-13. There is no proof that Gardner terminated Harwood because she was a woman. Indeed, while not dispositive, it is legitimate to infer that Gardner did *not* hold gender bias against Harwood, given that he hired Harwood in the first place. *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995).

## II. Harwood does not identify alleged conduct that would support a Title VII or ELCRA harassment claim.

Harwood also brings hostile environment claims. The Supreme Court has held that courts must decide whether "an environment is sufficiently hostile or abusive" by looking "at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Conduct "must be extreme to amount to a change in the terms and conditions of employment" and "simple teasing," "offhand comments," and "isolated incidents" are insufficient. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998).

Here, Harwood claims "sexual harassment *or* harassment based on her gender" without distinguishing the different proofs required for claims of sexual harassment versus facially-neutral conduct that a person claims is gender-based. *See T.C. v. Metro. Gov't of Nashville*, 378 F. Supp. 3d 651, 672-73 (M.D. Tenn. 2019)

-17-

(explaining distinction under federal law); *Haynie v. State*, 664 N.W.2d 129, 135 (Mich. 2003) ("conduct or communication that is gender-based, but that is not sexual in nature, cannot constitute sexual harassment"). Here, Harwood's allegations of "sexual" conduct are untimely and fall short of showing severe and pervasive conduct. And the rest of her complained-of conduct adds nothing to the inquiry.

## A.   Harwood cannot make out a timely, actionable hostile environment claim based on "sexual" harassment.

Besides the three 2014 incidents alleged in her complaint, *supra* p. 13-14 & Ex. F, Pl's Dep. 160:13-19, 167:22-168:1, 173:1-176:11, Harwood claims the "sexual" harassment included a January 2015 off-color joke by a subordinate during a company retreat to Mexico, *id.* at 199:13-202:16; NAB's ex-CIO implying, sometime prior to April 2016, that NAB retained a contractor because its agent was an attractive woman, *id.* at 204:3-20; and a January 2017 executive retreat in St. Maarten where male employees in the resort pool noticed and discussed a guest who was topless at a nearby beach, *id.* at 202:18-203:1. These allegations are insufficient.

*First*, these "sexual" claims are all untimely. Harwood's employment agreement contains a six-month statute of limitations, *supra* p. 5, which is applicable to ELCRA claims. *Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138, 141 (2005). This bars ELCRA claims accruing prior to February 17, 2018. The Title VII claims are subject to a 300-day statute of limitations, measured from the June 28,

-18-

2018 EEOC charge—meaning that claims prior to September 1, 2017 are untimely. But the last sexual allegation is from January 2017, and untimely under both statutes.

*Second*, this handful of events stretching over four calendar years is not "severe or pervasive" harassment under controlling law. The alleged conduct was isolated and infrequent. It was not threatening or humiliating; no offensive comments were directed at Harwood. Most of her complaints involve men simply noticing, discussing, or implying the attractiveness of women who did not work at NAB. But the law does not require "asexuality… in the workplace" or reach "genuine but innocuous differences in the ways men and women routinely interact with members of the. . . opposite sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The same is true for the photo that Harwood interprets as simulating a sex act; even if that is what the photo showed, the photo is merely Gardner and non-work friends offhandedly joking around at a holiday party.

And while Harwood complains about Gardner going to strip clubs, she admits it "wasn't just a male only kind of thing" and that women and men at NAB would go. Ex. F, Pl's Dep. 448:17-449:1. No one tried to force Harwood to go, and she chose not to. *Id.* 448:17-20. Instead, her issue with the strip club is the same issue she has with Gardner engaging in *any* "social outing" with co-workers: she believes that NAB's CEO is not allowed to discuss any business with his employees, even offhandedly, unless she is there—and she *speculates* that such discussions happened.

-19-

*Id.* at 393:20-399:1, 449:2-451:1. That is not a sexual harassment issue, as Harwood

implicitly conceded by omitting it from her list of sex harassment. *Id.* at 418:6-420:3.

Ultimately, courts in this circuit have held that *far* more frequent and offensive

comments fall short of proving a hostile environment. *See, e.g., Morris v. Oldham*

*County Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000) (request for sexual favors,

calling plaintiff "hot lips," and telling sexual jokes insufficient); *Gwen v. Regional*

*Transit Auth.*, 7 Fed. App'x 496 (6th Cir. 2001) (two instances in which a co-worker

exposed his genitals to the plaintiff and made rude comments insufficient); *Black v.*

*Zaring Homes, Inc.*, 104 F.3d 822, 823–23, 826 (6th Cir.1997) (insufficient where

employer called plaintiff a "broad," asked if she had been dancing on tables at a

biker bar, and made several sexual jokes to her); *Clay v. United Parcel Serv., Inc.*,

501 F.3d 695, 707 (6th Cir. 2007) (fifteen offensive utterances over 2-year period

insufficient). Harwood's handful of claims, even taken at face value, fall far short.

**B.    Harwood cannot show that her disputes with Gardner were because of gender, and in any event, she cannot establish a "hostile" environment.**

Harwood also tries to fit her business disputes with Gardner into a hostile-

environment framework, calling them "gender harassment." But where, as here, the

allegedly offensive conduct is not facially sexual in nature, the plaintiff cannot even

use those incidents to try to prove a hostile environment unless she can prove that

"but for the fact of her sex, she would not have been the object of harassment."

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999). Specifically, she

recasts Gardner's conversations with lower-level employees, or talking business to anyone without her present as "excluding" her from meetings, communications, and decisions.[4] R. 1, ¶¶ 40-46; *see* Ex. F at 368:19-370:1, 393:20-399:1.

But Harwood cannot prove that Gardner's practice of directly speaking with her subordinates, or that he sometimes had business conversations without her, was because she is a woman. For one thing, Harwood *knew* this was how Gardner managed things before she even accepted the job at NAB, and the prior COO was a man. *See supra* pp. 2-4; Ex. B, Gardner Decl. ¶ 8. And Harwood mostly speculates as to whether meetings were taking place without her, who initiated them, or whether they involved her areas of responsibility. Ex. F, Pl's Dep. 369:6-379:24. In fact, Harwood is wrong. Gardner met directly with lower-level operations employees before Harwood was COO. Ex. B ¶¶ 5-6. He frequently met with subordinates of his male CIO and CFO without those officers' presence. *Id.*; Ex. J, Haggarty Decl. ¶¶ 3a-3c. And he held one-on-one meetings with Harwood without male executives present. *See* Ex. F at 388:9-21, 399:10-13.

Harwood's other "evidence" of discrimination is likewise meritless. For example, she claims that Gardner "discriminated" against her by *not* swearing at her,

---

[4]Harwood's ELCRA "gender harassment" claim under is also untimely; only the last few days of her tenure (February 17-20, 2018) are within the contractual statute of limitations, *see supra* pp. 13, 18, and she does not allege "harassing" acts during those few days. *See Magee v. DaimlerChrysler Corp.*, 472 Mich. 108, 109 (2005).

or by having a different "tone" in his voice than the direct, unpleasant tone he occasionally had with male counterparts. Ex. F, Pl's Dep. 223:16-24. She also cites the "mom" comment from November 2017, but this single incident was not even sex-based. It related to a nepotistic conflict-of-interest issue. And in any event, one isolated out-of-context comment is insufficient, *Faragher*, 524 U.S. at 787–88, and would not refute that that the particulars of Gardner's management style were somehow exclusively applied to women, when the same applied to male colleagues.

In any event, Harwood's efforts to make these managerial disputes into a gender issue fail because those complaints are not the sort of "stuff" that a hostile environment claim is made of. The "touchstone of any hostile work environment claim... is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Khamati v. Sec'y of Dep't of the Treasury*, 557 F. App'x 434, 443 (6th Cir. 2014) (quoting *Harris*, 510 U.S. at 23). By contrast, "[p]ersonal conflict does not equate with discriminatory animus." *Morris*, 201 F.3d at 789. And Courts have frequently rejected efforts by plaintiffs to assert hostile environment claims when the complaints relate to management style, and not abusive words or actions.

For instance, in *Daniels v. Pike County Commissioners*, the Sixth Circuit held that while the supervisor did have an anti-woman bias, the catalog of "harassing"

-22-

incidents were largely unfavorable implementation of office policies: scheduling, dress code, unequal review of work-computer internet histories, speaking about a woman employee like she wasn't present, and so on. 706 F. App'x 281, 289-90 (6th Cir. 2017). The Court held that these events were not objectively hostile or abusive acts that changed the terms and circumstances of employment, as all of the issues were within the "realities of the responsibilities of office personnel." *Id.* at 290; *see also Terry v. Memphis Hous. Auth.*, 422 F. Supp. 2d 917, 925 (W.D. Tenn. 2006) (exclusion from meetings and being treated as a low-level employee not "abusive").

Likewise, in *Johnson v. Bolden*, the plaintiff's supervisor excluded him from meetings, was critical of him, used a "tone" when speaking to him, and made a "flippant" comment that men could not multi-task like women. 699 F. Supp. 2d 295, 302 (D.D.C. 2010), *aff'd* 492 F. App'x 118, 119 (D.C. Cir. 2012). The court held that "nearly all" of these complaints "amount to nothing more than plaintiff's objections to the management style of [the supervisor]," and that even considering the gendered comment, the plaintiff's issues were insufficient for a hostile environment claim. *Id.*

Harwood does not claim that Gardner or anyone else intimidated, ridiculed, or insulted her, let alone that it "permeated" the workplace. Her complaints over how Gardner ran his business are the sort of ordinary workplace complaints that any managerial employee might expect, and which Harwood knew to be Gardner's style

-23-

going into the job. And Harwood claims that her own job results were not affected. Ex. F, Pl's Dep. 198-3:11. This is not a hostile environment claim.

## III.   Harwood's retaliation claims fail as a matter of law.

Harwood alleges no direct evidence of retaliatory termination, and thus the *McDonnell Douglas* test applies. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018). Her claim of "protected activity" has been inconsistent—the Complaint cites the August 2017 dBusiness article, R. 1 ¶ 51, while at deposition she implied it was her November 27, 2017 accusation after the deployment meeting, nearly four months before termination. Ex. F, Pl's Dep. 422:2-7.

She cannot establish *prima facie* causation either way. Adverse action shortly after protected activity can be sufficient proof of causation under Title VII, but after more than "roughly three months," an inference of causation requires "other evidence of retaliatory conduct." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 615 (6th Cir. 2019) (citing cases). Here, the termination was four months after the protected activity, so more proof is needed. But all that Harwood alleges as subsequent retaliatory acts are (1) his not talking to her at two social events, while still discussing work with her, and (2) various business disagreements—all of which she admits had been ongoing beforehand. Ex. F at 422:2-431:9; *supra* pp. 6-8.

As common sense dictates, alleged disparate treatment that "took place before she engaged in protected activity" is not proof of retaliation. *Blizzard v. Marion*

*Tech. Coll.*, 698 F.3d 275, 289 n.8 (6th Cir. 2012). Here, Harwood admits that Gardner's change in attitude toward her and their constant conflict occurred in June 2017, *supra* pp. 7-8, and thus does not imply causation. And Harwood had repeatedly complained about issues she perceived as gender-related for years, without adverse consequences, including an admittedly nonchalant reaction by Gardner to her dBusiness comment. *See* Ex. F, Pl's Dep. 168:13-23, 180:18-181:11, 416:13-417:14. But even if Harwood had a *prima facie* case, she cannot show that her dismissal stemming from management clashes with Gardner is false and pretext for retaliation for the same reasons it is not pretext for discrimination, *supra* at I.B.

## IV.   Harwood's Title VII claims against Gardner should be dismissed.

The Complaint names Gardner as an individual defendant. R. 1, Pg ID 1. Title VII does not permit liability against individuals. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 406 (6th Cir. 1997). Summary judgment is appropriate on this ground too.

### Conclusion

Summary judgment should be granted.

/s/ Elizabeth Hardy
Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
Attorneys for Defendants
280 N. Old Woodward Ave., Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

Dated: November 21, 2019
312160

## Certificate of Service

I hereby certify that on November 21, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ Elizabeth Hardy
Elizabeth Hardy (P37426)
Kienbaum Hardy Viviano
 Pelton & Forrest, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
E-mail:  ehardy@khvpf.com

349267