UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERESA HARWOOD,

                          Case No. 18-cv-12567

            Plaintiff,

v.                              Paul D. Borman
                              United States District Judge

NORTH AMERICAN BANCARD LLC,
and MARC GARDNER,

                              Elizabeth A. Stafford
                              United States Magistrate Judge

                Defendants.
_____/

## OPINION & ORDER DENYING, IN PART, AND GRANTING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 26)

### I.    INTRODUCTION

Plaintiff Teresa Harwood says that Defendant Marc Gardner fostered a "highly sexualized" and "sexually hostile" environment as Chief Executive Officer (CEO) at his company, Defendant North American Bancard LLC (NAB). (ECF No. 35, Response, PgID 1693–94.) She says that Gardner terminated her from her position as Chief Operating Officer (COO) of NAB because of her gender and in retaliation for her complaints about being treated differently because she is a woman. (*Id.* at PgID 1694.) Gardner says that he terminated Harwood because of problems with her direct-report departments, and because he realized that her management style is irreconcilably different than his—thus, he writes off her claims of hostile environment sex discrimination and retaliation under Title VII and Michigan's Elliot-Larsen Civil Rights Act (ELCRA) as "business disputes."

(ECF No. 26, MSJ, PgID 151.) Accordingly, Defendants Gardner and NAB filed a Motion for Summary Judgment, which is now before the Court. (ECF No. 26.)

Although Harwood abandoned her gender discrimination claims in her Response, she has established a genuine dispute of material fact on her Title VII hostile environment discrimination and retaliation claims against Defendant NAB, and her ELCRA retaliation claim against Defendant Gardner. Accordingly, the Court grants the Motion for Summary Judgment (ECF No. 26) insofar as it seeks dismissal of the gender discrimination claims, the Title VII claims against Defendant Gardner and the ELCRA hostile environment claims. The Court denies the Motion on all other counts.

## II.    FACTS

The following facts are recounted in the light most favorable to the non-moving party—here, Plaintiff Teresa Harwood. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

Gardner, the CEO founder, and sole shareholder of NAB[1] hired Harwood to the position of COO in the fall of 2012. (ECF No. 29, Gardner Dep., PgID 560,

---

[1] NAB is an independent sales organization in the credit card processing industry. (ECF No. 26-3, Gardner Decl., PgID 223, ¶ 3.)

573.) Gardner had terminated the prior COO, Gary Rutledge a few months earlier for performance issues. (*Id.* at PgID 571–72.) A consultant hired by NAB believed that Harwood would add value and recommended that NAB hire her to replace Rutledge. (*Id.* at PgID 569.) Gardner knew Harwood because NAB was a customer of Global Payments, where Harwood was the Senior Vice President of Services Operations at the time, and he "believed that she had the skill set to be NAB's COO." (*Id.* at PgID 568–69; ECF No. 35-2, Harwood Resume, PgID 1721; ECF No. 26-3, Gardner Decl., PgID 224–25, ¶ 9.) Gardner reached out to Harwood and, after she interviewed and negotiated the terms and salary of the job, Gardner hired her to be NAB's COO. (ECF No. 29, Gardner Dep., PgID 569, ECF No. 29-4, Harwood Dep., PgID 1143, 1147, 1154–59.) She started in October of 2012. (ECF No. 35-3, Offer Letter, PgID 1725–26.)

Harwood viewed the job opportunity at NAB as a new challenge. Her prior jobs had been with large, publicly traded companies that served independent sales organizations like NAB, so the position at NAB would require her to learn a new side of the industry. (ECF No. 29-4, Harwood Dep., PgID 1139–40.) She also knew Gardner from working with him as a customer. (*Id.* at PgID 1150.) She knew that he had a short temper, that he was demanding, that he used a lot of profanity,

and that he always thought he was right so he was very difficult to convince that he was wrong. (*Id.* at PgID 1150–51.) Her conversations with people within and without NAB confirmed that he was difficult to work with and that he was "going to be equally demanding of [her] as an employee as he was of [her] as a vendor." (*Id.* at PgID 1149, 1151.) The head of human resources for NAB at the time, Danielle Crane, also told Harwood that she felt that Gardner was not listening "to some of the female leaders that he should be listening to and was allowing himself to be overly influenced by some of the male employees." (*Id.* at PgID 1144.) Based on this information, Harwood viewed the task of getting Gardner to listen to her as a challenge. (*Id.* at PgID 1152.) She accepted the challenge and started the job trying to leave her preconceived notions about Gardner behind. (*Id.*)

At first, Harwood did not feel that Gardner was "overly aggressive or assertive or demanding" of her, and found that he did not "yell and scream at [her] like he did when [she]was his vendor." (*Id.* at PgID 1154–55.) He was also "very receptive to suggestions." (*Id.* at PgID 1155.) An example of Gardner's initial receptivity to Harwood's suggestions was his decision to follow her advice and hire an outside business consulting firm, Franklin Covey, to teach a course on increasing productivity through increasing trust. (*Id.* at PgID 1170–71.) NAB

4

offered the course in February of 2013. (*Id.* at PgID 1174.) Shortly thereafter, NAB hired Gary Jewkes, a Franklin Covey consultant, to coach the executive team and privately coach Gardner. (*Id.* at PgID 1176.) Gardner thought that Harwood's suggestion to hire Franklin Covey was "sound," that using an outside consulting firm "added value," and that Franklin Covey ultimately helped NAB "improve as an organization on multiple fronts." (ECF No. 29, Gardner Dep., PgID 643, 652.)

Harwood suggested hiring Franklin Covey because she believed there were significant problems with NAB's corporate culture. (*See* ECF No. 29-4, Harwood Dep., PgID 1384–88.) Specifically, she witnessed meetings where senior level employees were calling lower level employees liars and using a lot of profanity, she thought that too much of time in meetings was spent trying to figure out who was to blame for something going wrong, she thought there was a "tremendous amount of conflict," and that senior level people were having "blatant outbursts of anger" during meetings with all levels of employees. (*Id.* at 1172–73, 1385–86.) She said that Gardner was one of two people "most notorious" for this kind of behavior. (*Id.* at 1387.)

Other members of NAB's executive team agreed that Gardner would swear and yell at, or around, employees who did not accomplish tasks to his satisfaction.

Chief Experience Officer (CXO) Jim Parkinson testified that he witnessed Gardner swearing and yelling at, or in the presence of, employee Laurie Jones when he was upset about the state of a project even though he did not have all of the information about why it was going wrong. (ECF No. 29-1, Parkinson Dep., PgID 757–60.) Parkinson also testified that he witnessed Gardner treat Harwood the same way. (*Id.* at PgID 763–65.)

Chief Financial Officer (CFO) Kirk Haggarty confirmed that Gardner "will raise his voice in a meeting and use profanity" and said he knows that other people have said that Gardner "might have been off base on avenues that he's going down with them as he's evaluating and looking at various projects or activities." (ECF No. 29-2, Haggarty Dep., PgID 873–75.) These members of the team attribute this behavior to the fact that Gardner is a typical entrepreneur—intense, impatient, and aggressive. (*Id.* at PgID 873, 896, 902; ECF No. 29-1, Parkinson Dep., PgID 766–67; ECF No. 29-3, Kellogg Dep., PgID 976.) Harwood thought that NAB could improve and that projects could be completed faster if the culture of anger and blame was changed. (ECF No. 29-4, Harwood Dep., PgID 1173–74.)

One other aspect of NAB's corporate culture and Gardner's management style that frustrated Harwood was her sense that Gardner would seek input from

her all-male peer group rather than from her on things for which she was responsible. (*E.g.*, ECF No. 29-4, Harwood Dep., PgID 1190 ("I heard from Jim that Marc [Gardner] had asked him about a customer issue that I was responsible for.").) Harwood testified that Gardner would regularly ask the other members of the C-suite for information on issues in her purview, but he would never ask her for information on issues in the purview of others. (*Id.* at PgID 1190–92.)

Harwood testified that her sense of exclusion from the C-suite team also came from her experience that "on nearly every Monday executive meeting, there was a conversation amongst Kirk [Haggarty], Jim [Parkinson], and Marc [Gardner] about conversations that they either collectively or maybe . . . just Marc and Jim or just Marc and Kirk, had had over the weekend." (*Id.* at PgID 1433.) She said that Parkinson and Haggarty would convey messages to her from conversations they had just had with Gardner, while Gardner would fail to show up to scheduled meetings with her. (*Id.*) Finally, she said that employees who reported directly to her would be summoned to meetings involving Gardner and the other members of the team but not her. (*Id.* at PgID 1433–34.)

Harwood raised her concerns about her exclusion with Gardner and explained to him how it made her feel "ad nauseum." (*Id.* at PgID 1192.) She

7

described several examples of this behavior and the conversation she would have with Gardner after the fact—on one occasion Gardner asked Haggarty to reach out to an employee who reported to Harwood to get information instead of waiting to ask Harwood in an upcoming meeting and, when Harwood asked why Gardner did not go directly to her, she was told that it was "all based on proximity." (*Id.* at PgID 1243.) On another occasion, Gardner asked Haggarty to research a performance question with one of Harwood's direct reports instead of going to Harwood. (*Id.* at PgID 1444–45.) When Harwood asked Gardner why he did not reach out to her instead, he responded that Haggarty was already in his office. (*Id.* at PgID 1445.) Gardner recalled her complaining about this issue and said that his "typical response" was "I don't share your opinion, you're entitled to your opinion, I'm not going to try to change it." (ECF No. 29, Gardner Dep., PgID 649.)

Gardner attributed this behavior to his "hands-on style" of management. (ECF No. 26-3, Gardner Decl., PgID 223–24, ¶¶ 4–7.) He said that he believes that "as the CEO and owner, [he] can reach out to any available person to provide me with information, or take care of a task that is required, without having to delay or go through a formal chain-of-command." (*Id.* at PgID 223, ¶ 5.) CFO Kirk Haggarty testified that Gardner frequently canceled meetings with him or failed to

participate in "phone calls that should take place," but felt that the proper way to deal with "a fairly active individual entrepreneur like Marc [Gardner]" was to "be vigilant in tracking [him] down." (ECF No. 29-2, Haggarty Dep., PgID 911.) CXO Jim Parkinson agreed that Gardner did not always show up to scheduled meetings with him, but also testified that he was usually accessible when Parkinson needed him. (ECF No. 29-1, Parkinson Dep., PgID 769–770.) Harwood testified that Gardner's style uniquely affected her because she was never nearest to Gardner when he wanted information from the nearest person—in her words, "it was all based on proximity, but the problem with that was I never got proximity, because Marc [Gardner] didn't make himself available to me on as ready a basis as he did with them." (ECF No. 29-4, Harwood Dep., PgID 1243.)

In addition to this ongoing frustration, Harwood points to five specific incidents in support of her claim that Gardner fostered a "sexually hostile environment" at NAB. (ECF No. 35, Response, PgID 1694.) First, in April of 2014, NAB hired scantily-clad models to mingle with guests at an event it hosted in Las Vegas during the Electronic Transaction Association trade show. (ECF No. 29-4, Harwood Dep., PgID 1228–29.) Harwood remembers that they were wearing "shortie shorts," that their midriffs were bare, and that they were wearing shirts

with the brand name of an NAB product on them. (*Id.* at PgID 1229.) Haggarty likened their outfits to the attire of a typical Las Vegas cocktail server, and said that they were paid to mingle with NAB's guests at its private party. (ECF No. 29-2, Haggarty Dep., PgID 898–99.) He also said that it was Gardner's idea to have the models there, in order to aggressively promote the brand. (*Id.* at PgID 900, 902.) Harwood recalled that one of the models exposed her breasts when she was "egged on" by some party attendees. (ECF No. 29-4, Harwood Dep., PgID 1231–32.) She said that two American Express employees had to leave the party because of their company's code of conduct. (*Id.* at PgID 1231.) When she confronted Gardner about his decision to hire the models and told him that it was "professionally inappropriate," he laughed at her and told her that next time he would hire male strippers. (*Id.* at 1229–30.)

Gardner testified that he did not hire any models to work any party, but that he does use "talent agencies" to hire people to work events and that those talent agencies might send women to be "product advocates" because the industry is "heavily populated by men" and "more men would like to speak to women about product versus more men." (ECF No. 29, Gardner Dep., PgID 695–700.) He also

denied ever hearing that one of them exposed her breasts or saying that he would invite male strippers the next time. (*Id.* at PgID 698, 702–03.)

The second incident was at the NAB holiday party in December of 2014. (ECF No. 29-4, Harwood Dep., PgID 1237.) There was a photo booth at the party and the photos that were taken at the booth were posted to the company intranet the following day. (*Id.* at PgID 1234.) At the photo booth Gardner took a photo with two women in which the women, according to Harwood, were "in poses simulating sex acts on Marc [Gardner]." (*Id.*) Harwood thought the photo was inappropriate so she sent outside counsel David Greenberg an email to get the photo taken down and brought it to CFO Kirk Haggarty's attention. (*Id.*; ECF No. 29-2, Haggarty Dep., PgID 830–32.) Gardner testified that he did not think the picture was inappropriate and that it looked to him like the woman who Harwood said was simulating oral sex was simply taking a picture with her phone. (ECF No. 29, Gardner Dep., PgID 599–600.)

The third incident also happened at the NAB holiday party in December of 2014. As the party was ending, Gardner, his cousin and NAB employee Adam McDonald, and a group of people invited Ashley Fisher, the newly hired director of marketing, to go with them to a strip club on Eight Mile. (ECF No. 29-4,

11

Harwood Dep., PgID 1237–39.) As Gardner remembers it, McDonald asked him to come along, then Fisher asked him where there were going, so Gardner told her and she asked if she could come. (ECF No. 29, Gardner Dep., PgID 609.) Harwood says that Fisher told her about the incident the following day and said that she had been caught off guard by the invitation and had felt like she was expected to go. (ECF No. 29-4, Harwood Dep., PgID 1237–39.) Harwood notified the head of human resources, Julia Kellogg about the incident after it happened, but Fisher never reported it to Kellogg. (ECF No. 29-3, Kellogg Dep., PgID 1032.)

The fourth and fifth incidents occurred during "executive off-sites." These off-sites involved the senior leadership of NAB, which was around thirty people, traveling abroad for two to three days of meetings, meals, and activities.[2] (*See* ECF No. 29, Gardner Dep., PgID 622–23, 626; ECF No. 29-1, Parkinson Dep., PgID 782.) In January of 2015, during an off-site in Mexico, the executive team was in a cavern for a wine tasting and Adam McDonald "made an observation about one of the rock formations being eerily similar to a giant clitoris, which garnered a round of enthusiastic laughter from just about everybody there." (ECF No. 29-4,

---

[2] Harwood also testified that she was excluded from after-hours socializing at these off-sites. (ECF No. 29-4, Harwood Dep., PgID 1260.)

Harwood Dep., PgID 1260.) CXO Jim Parkinson said that others at the event felt the comment was inappropriate. (ECF No. 29-1, Parkinson Dep., PgID 783–84.) Harwood talked to Gardner and McDonald about it and McDonald apologized. (*Id.*; ECF No. 29-4, Harwood Dep., PgID 1261–62.)

Two years later, in January of 2017, during the executive off-site in St. Maarten, Harwood was in the pool having drinks with the others—the only woman in the group—while all of the men were talking about a woman who went to the beach topless everyday who they thought was very attractive. (ECF No. 29-4, Harwood Dep., PgID 1263–64.) When the woman arrived at the beach, all the men, including McDonald and Gardner, "ran to the edge" of the pool and made comments about wishing she was running. (*Id.* at PgID 12364.) Gardner remembered "a very attractive woman" that did yoga on the beach but did not remember watching her and commenting about her in the way that Harwood described. (ECF No. 29, Gardner Dep., PgID 1629–630.) Haggarty also recalled seeing a woman doing yoga on the beach near the location of NAB meetings and activities. (ECF No. 29-2, Haggarty Dep., PgID 878.)

Harwood and Gardner's relationship began to deteriorate in 2016 and took a sharp decline in the summer of 2017. (ECF No. 29-4, Harwood Dep., PgID 1220,

1222–24.) Gardner and Harwood attributed this deterioration and decline, which culminated in her termination on February 20, 2018, to different events. Harwood said Gardner's exclusionary behaviors increased and his receptivity to her declined after she returned from bereavement leave in early February 2016. (*Id.* at PgID 1222–23.) She said that in mid-2017 Gardner stopped trying to make progress toward making the changes that she encouraged. (*Id.* at PgID 1217.) Gardner said that he had growing concerns about Harwood's performance, priorities, and leadership, and that he was concerned with dysfunction among the members of the executive team. (ECF No. 26-3, Gardner Decl., PgID 225–30, ¶¶ 11–19.)

On March 18, 2016, Harwood sent Gary Jewkes, the consultant from Franklin Covey, an email that summed up her frustrations with Gardner at the time. (ECF No. 35-8, Email to Jewkes, PgID 1754.) The email describes Gardner losing his temper in meetings with members of Harwood's team, getting frustrated with employees who were not able to answer questions on issues outside the scope of the meeting topics, and focusing on minutia. (*Id.*) The email also describes Gardner acknowledging that he has room to improve. (*Id.*) Jewkes replied by encouraging Harwood to unite with the rest of the executive team to ask Gardner to change. (*Id.* at PgID 1753.) At the time, Harwood felt that she had the support of the rest of the

14

C-suite, even though her relationship with Gardner was declining. (ECF No. 29-4, Harwood Dep., PgID 1216–17.) Later in 2016, Haggarty informed Harwood that he thought Gardner was not going to change and that he would rather use his energy on other things. (*Id.* at PgID 1217.)

In mid-2017 Gardner stopped trying to change, and tension between Gardner and Harwood increased. (*Id.*) Harwood attributed the change to NAB's acquisition of Total Merchant Services (TMS) in June. (*Id.* at PgID 1217, 1219.) It was the largest acquisition in NAB's history, and Gardner said that Harwood did not show the level of engagement in the acquisition that he expected. (ECF No. 26-3, Gardner Decl., PgID 225–26, ¶ 11.) Harwood said that she was excluded during the acquisition—she was not informed that they would be dressing casually for a due diligence meeting, she was not invited to a dinner with the others during the trip, and she was excluded on calls. (ECF No. 29-4, Harwood Dep., PgID 1224–25.)

During the acquisition, Harwood failed to call in to "a pretty important conference call," the "closing" call, with NAB's attorneys during the late stages of this largest acquisition. (ECF No. 29-2, Haggarty Dep., PgID 933–34.) Harwood did not recall getting the email that indicated that she needed to participate in the

call. (ECF No. 29-4, Harwood Dep., PgID 1532–37.) She was out of the office during that time and had not realized that she would be asked to participate in the call because she had not done so for other acquisitions. (*Id.* at PgID 1533.) She was able to provide the attorneys the needed information later on a separate call. (*Id.* at PgID 1535.)

Harwood and Gardner clashed on two substantive business and personnel issues in 2017. First, Gardner was upset with the call times customers were experiencing in NAB service centers and blamed Scott Fessler, the Vice President of Customer Care who reported to Harwood, while Harwood attributed the problems to a number of factors outside Fessler's control. (*Id.* at PgID 1326, 1334– 38.) According to Gardner, when he said that he wanted to decrease the times to a specific level by the end of the year or fire Fessler, Harwood asked if he was telling her who could be on her team. (ECF No. 29, Gardner Dep., PgID 675–79.) He responded that he was because he wanted the outcome by whatever means necessary. (*Id.*) Harwood did not specifically remember that conversation but did know that Gardner blamed Fessler for the poor service levels. (ECF No. 29-4, Harwood Dep., PgID 1334, 1338.) Harwood said that Fessler resigned shortly after

she left, (*id.* at 1338) whereas Gardner said that he was terminated. (ECF No. 29, Gardner Dep., PgID 677.)

Second, Gardner felt that Geoff Stocki, the Vice President of Underwriting and Risk who reported to Harwood, underperformed because he failed to implement phone verification and because underwriting times for new merchants were too slow. (ECF No. 26-3, Gardner Decl., PgID 228, ¶ 16.) Harwood attributed the underwriting delays to extended absences by other members of the team and a change of tools used for automation and thought that Stocki was a top performer. (ECF No. 29-4, Harwood Dep., PgID 1340, 1342–43.) She did not recall having a conversation with Gardner about Stocki's performance. (*Id.* at PgID 1343.)

The parties identify three other events throughout 2017 as potential contributors to the declining relationship between Gardner and Harwood. First, on August 9, 2017 dBusiness published an article called "2017 Powered by Women," that profiled "eight professional women who are driving growth in Michigan, the nation, and the world." (ECF No. 26-12, Article, PgID 512.) Harwood was one of the eight women that consented to be profiled in the piece. (*Id.* at PgID 513.) The article's section on Harwood concluded with this:

> As good as Harwood is at finding answers, she's recently encountered some communication snags that may stem from her being female. "It's kind of interesting, really," she says. "There are circumstances when, rather than consult me for items that are in my span of control, my peer group (all male) is consulted instead."
>
> When her peers come to Harwood for the answer, which they inevitably must, she takes control and goes back to the initial requestor with the information—reminding them of where the answers actually are. "I'm a pretty assertive individual and I don't lack knowledge in the industry," she says. "Most of my mentors and direct bosses have been men, so I model a lot of my behavior after them."

(*Id.* at PgID 514.) Gardner did not have a noticeable reaction to the article, nor did any of the members of the executive team except Parkinson. (ECF No. 29-4, Harwood Dep., PgID 1480–81.) Parkinson saw the article and felt that the comments in it were unfair to him and his relationship with Harwood, and he felt that it was inappropriate to divulge that kind of information to the press, and thus, to the public. (ECF No. 29-1, Parkinson Dep., PgID 799.) When Parkinson confronted Harwood about the article, they disagreed on if it was accurate, and afterwards Parkinson felt that their relationship and their trust were diminished. (*Id.* at PgID 800–01, 804.) Haggarty later testified that he also found Harwood's decision to share her feelings about her treatment to the press distasteful. (ECF No. 29-2, Haggarty Dep., PgID 943.)

18

Second, on October 5, 2017, Gardner went to lunch with Mike Vaughn, the former COO of TMS—the company NAB had just acquired. (ECF No. 26-3, Gardner Decl., PgID 226, ¶ 12.) At the lunch, Vaughn told Gardner that he was uncomfortable being at the lunch because Harwood had instructed him to not engage with Gardner directly about business matters. (*Id.*; ECF No. 29, Gardner Dep., PgID 668.) Gardner felt that Harwood's instructions to Vaughn undermined his authority and that Harwood was trying to work around his "collaborative style." (ECF No. 29, Gardner Dep., PgID 668.)

Third, and finally, Harwood testified that she and Gardner had a conversation on November 27th that prompted Gardner to ostracize her until her termination. (ECF No. 29-4, Harwood Dep., PgID 1226.) According to Harwood, this conversation started in her office about one topic and then shifted to a meeting they had had two weeks prior about outsourcing their deployment department. (*Id.* at PgID 1291–92.) Two of Harwood's sons were hired into the NAB deployment department in 2015 and 2016, and remained employed in the department at the time of this conversation. (*Id.* at PgID 1504.) This was in violation of NAB's "Employment of Relatives" policy, which states, "[r]elatives may not directly or indirectly supervise one another in the same department or organization." (ECF

19

No. 26-16, Employee Handbook, PgID 536, 538, 540, 543.) Harwood's sons reported to a manager, Jon Tomasak, who reported to Kevin Wineke, who reported to Scott Webb, who reported to Harwood. (ECF No. 29-4, Harwood Dep., PgID 1508.) Harwood was not aware of any enforced policy regarding hiring relatives, however, because Adam McDonald, Gardner's first cousin, was employed at NAB and because the prior COO's son worked in the deployment department and thereby reported indirectly to his father. (*Id.*) She did talk to Scott Webb when her first son was interviewing "to make sure that he was comfortable and, you know, that he [Webb] shouldn't hire him [Harwood's son] unless he really thought he was the right person for the job." (*Id.* at PgID 1502.) Harwood testified that Webb "assured [her] that he had effectively managed the former COO's son in the deployment center and he felt no concerns about that at all." (*Id.*) She said that "may have" talked to Webb again when her second son was interviewing. (*Id.* at PgID 1504.) Harwood did not recall talking to anyone else in the organization about her sons working there, but she and her sons did not hide their relationship. (*Id.* at PgID 1507.)

Once the conversation turned to the meeting about outsourcing deployment department, where her two sons worked, Harwood told Gardner that she found it

"absolutely appalling" that she had not been included in the conversation about outsourcing much earlier because she had significant relevant experience. (*Id.* at PgID 1292.) Gardner responded, "if you weren't a mom you could have." (*Id.* at PgID 1293.) Harwood then asked Gardner, "if I was a dad it would be different?" and he responded, "maybe." (*Id.*) At this point, Harwood said, "I've told you time and time again for your benefit and for the benefit of NAB, you have to stop treating me differently than my male counterparts. You have to stop." (*Id.*) After that, Harwood left, and she and Gardner did not have a one-on-one conversation "of any depth or any extended period of time" again. (*Id.*; *see also id.* at PgID 1226, 1271–1273, 1486.) Harwood described this meeting as one where she really stood up for herself and was more demanding and more substantive than ever before. (*Id.* at PgID 1486–92.) She said afterwards Gardner refused to talk to her, did not return her calls or texts, did not speak to her at NAB events, and physically avoided her.[3] (*Id.* at PgID 1271–76, 1293, 1490.) She also said her contact and communication with her peers on the executive team decreased. (*Id.* at 1273.)

---

[3] Text messages provided by Defendants show that Gardner did reply to several work-related texts from Harwood after November 27, 2017. (ECF No. 37-1, Texts, PgID 1770–82.)

Gardner did not specifically remember the November 27th conversation with Harwood. (ECF No. 29, Gardner Dep., PgID 706.) He characterized most of her complaints as being related to her desire to change NAB's business model to an "everyone having a specific role and not get out of their lane" type of model, though he did acknowledge that she complained of different and unfair treatment in terms of Gardner not spending time with her outside of the office. (*Id.* at PgID 707, 712.) He denied saying the comment about her being a mom and said that Harwood was excluded from the outsourcing meeting because her sons worked in the department that would be shut down if they decided to outsource. (ECF No. 26-3, Gardner Decl., PgID 229, ¶ 17.) Harwood did not believe that her sons' jobs created a conflict of interest for her because their jobs would not impact her decision-making. (ECF No. 29-4, Harwood Dep., PgID 1277.) She did admit, however, that she did not discuss hiring her sons with any other member of the C-Suite—just Webb and a recruiter in human resources. (*Id.* at PgID 1507.)

In January of 2018, Harwood got an email from Rob Smith, NAB's general counsel, asking her if she required any follow-up from her November 27th conversation with Gardner. (*Id.* at PgID 1287.) She asked Julia Kellogg, the head of human resources, about the email and told her about the November 27th

conversation. (*Id.* at PgID 1288.) Kellogg does not remember that conversation, nor does she remember a conversation with Harwood about an email Harwood sent on November 15, 2017 saying that "the culture at NAB has eroded over the past year" and that she faces "harassment, abuse, and bullying constantly." (ECF No. 29-3, Kellogg Dep., PgID 1022, 1029, 1053; ECF No. 35-9, Email to Kellogg, PgID 1756.) Harwood was surprised to get an email from Smith because that had never happened after any prior conversation with Gardner about being treated differently based on gender. (ECF No. 29-4, Harwood Dep., PgID 1288, 1489–90.)

According to Gardner, he began to contemplate terminating Harwood in the fourth quarter of 2017. (ECF No. 29, Gardner Dep., PgID 664.) He was motivated by their "overarching disagreement in management styles" and the dissatisfaction of the other members of the executive team with the work environment. (*Id.* at 665; *see also* ECF No. 26-3, Gardner Decl., PgID 229–230, ¶¶ 18–19.) Around this time, Gardner asked Haggarty for feedback on the C-suite environment, and Haggarty discussed Harwood's failure to participate in the call on the TMS acquisition and the friction within the executive team with Gardner. (ECF No. 29-2, Haggarty Dep., PgID 922–36.) Gardner did not tell Haggarty that he was considering termination. (*Id.* at PgID 935–36.) Haggarty implied that he might not

stay at NAB long term if Harwood continued with NAB. (*Id.* at PgID 939.) Parkinson was not involved in the termination decision-making process. (ECF No. 29-1, Parkinson Dep., PgID 750.)

Gardner made the decision to terminate Harwood by February of 2018. (ECF No. 26-3, Gardner Decl., PgID 230, ¶ 19.) He directed David Greenberg, outside counsel, to "inform Ms. Harwood and handle the termination." (*Id.*) Greenberg recalled becoming aware that Gardner was going to terminate Harwood sometime in the "late end of 2017" or early 2018. (ECF No. 29-5, Greenberg Dep., PgID 1669–70.) Harwood was terminated on February 20, 2018. (*Id.* at PgID 1670.) Greenberg told Harwood that it was because Gardner had decided to move in a different direction. (ECF No. 29-4, Harwood Dep., PgID 1512.)

Harwood filed a charge with the EEOC on June 28, 2018. (ECF No. 26-14, EEOC Charge, PgID 528.) In it, she claimed discrimination based on sex and retaliation, indicating that her statements in the dBusiness article prompted retaliation by Gardner. (*Id.*) The EEOC issued a right-to-sue letter on August 9, 2018. (ECF No. 1-2, Right to Sue, PgID 29.) Harwood filed her Complaint on August 17, 2018. (ECF No. 1, Complaint.)

### III.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon its mere allegations or denials in the pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some

metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986) (footnote and internal quotations omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran*, 788 F.3d at 204. At the same time, the non-moving party must produce enough evidence to allow a reasonable jury to find in its favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. "The 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. That party cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions," *Arendale v. City of Memphis*, 519 F.3d 587,

27

560 (6th Cir. 2008), but must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed. R. Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" Ibid. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558–59 (internal citations omitted).

A court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

# IV.   ANALYSIS

Harwood brings claims against Gardner and NAB under Title VII, which makes it illegal for an employer to discriminate against an individual because of the individual's sex, and under ELCRA, the parallel Michigan statute that also bans workplace discrimination based on sex. 42 U.S.C. § 2000e-2(a); Mich. Comp. L. § 37.2202(1)(a). Harwood's Complaint alleged three parallel claims—gender discrimination (Counts I & IV), harassment/hostile work environment (Counts II & V), and retaliation (Counts III & VI)—but Harwood abandoned her gender discrimination claims by failing to address them in her Response to the Motion for Summary Judgment. (ECF No. 35, Response); *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. Oct. 10, 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

During the April 10 telephonic motion hearing, Counsel for Harwood argued that even though Harwood, in her Response, never explicitly mentioned Counts I and IV, never discussed the elements of the prima facie case, and never explained how there was a genuine dispute of material fact on these claims, the gender

29

discrimination claims were not abandoned because the claims are supported by the facts discussed in the Response. The Court is not persuaded—Defendants, in their Motion for Summary Judgment, addressed the gender discrimination claims with specific arguments that Harwood made no attempt to counter in her Response. (ECF No. 26, MSJ, PgID 163–66.) That is clear abandonment.

Thus, the Court need only address Harwood's parallel Title VII and ELCRA claims of harassment/hostile work environment and retaliation. Before reaching the substance of those claims, two threshold issues must be addressed: (1) Gardner's personal liability; and (2) the statutory and contractual limitations periods.

## A.    Gardner's Personal Liability

Defendant Gardner is entitled to summary judgment on Harwood's Title VII claims against him (Counts II & III) because individuals may not be held personally liable under Title VII. *Wathen v. General Electric Co.*, 115 F.3d 400, 405–06 (6th Cir. 1997) (interpreting the phrase "any agent of such a person" in the definition of "employer" in Title VII as incorporating respondeat superior liability not as making individual supervisors personally liable).

Gardner may, however, be held personally liable under ELCRA because the Michigan Supreme Court has held that an individual "agent" of an employer is

individually liable under ELCRA when that agent is the wrongdoer. *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 421 (2005) (interpreting ELCRA definition of employer, "a person who has 1 or more employees, and includes an agent of that person," as creating individual liability for wrongdoing agents of employers). Under ELCRA, "persons to whom an employing entity delegates supervisory power and authority to act on its behalf are 'agents,' as distinguished from coemployees, subordinates, or coworkers who do not have supervisory powers or authority." *Elezovic v. Bennett*, 274 Mich. App. 1, 10 (2007). There is no dispute that Gardner had supervisory power over Harwood, and therefore Gardner is an agent of NAB under ELCRA. Gardner is accused of wrongdoing, so he is subject to personal liability for Harwood's ELCRA claims.

### B. Timeliness

Defendants argue that Harwood's harassment/hostile work environment claims are not timely. (ECF No. 26, MSJ, PgID 167–68.) Harwood's ELCRA claims are subject to the contractual six month limitation period set out in her employment contract. Unambiguous provisions shortening the period of limitations are enforceable under Michigan law unless the contract is unconscionable or otherwise against public policy. *Clark v. DaimlerChrysler Corp.*, 268 Mich. App.

31

138, 142, 144 (2005) (finding contractual six-month limitations period for employment claims enforceable). The provision in Harwood's contract, "any claim or lawsuit arising out of [her] employment . . . must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit," is unambiguous and therefore enforceable. (ECF No. 26-16, Employee Acknowledgment, PgID 534.)

Harwood's Title VII claims are not subject to the six-month limitation period from her contract because the Sixth Circuit has found that "the 300-day limitation period to sue under Title VII is a substantive, rather than procedural, rule. . . [so it] is not prospectively waivable as it pertains to litigation." *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 829 (6th Cir. 2019). Thus, Harwood's Title VII claims are subject to the statutory 300-day limitation period.

The limitations clock for both Title VII and ELCRA claims starts on the date of the injury. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) ("A party . . . must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it."); *Magee v. DaimlerChrysler Corp.*, 472 Mich. 108, 113 (2005) (ELCRA limitations period starts on date of injury). For Title VII claims of retaliation, each discrete retaliatory adverse employment decision, such

32

as termination, is a separate injury that starts a separate limitations clock. *Morgan*, 536 U.S. at 110–115. For hostile environment claims under Title VII, "the entire hostile work environment encompasses a single unlawful employment practice," so each act contributing to the hostile environment does not start a separate limitations clock. *Id.* at 117. Instead, a claim is timely so long as one of the acts that make up a single claim of hostile environment discrimination occurred within the limitations period. *Id.* at 118.

The Michigan Supreme Court followed the United States Supreme Court's lead by holding that, under ELCRA, discrete acts of discrimination start separate limitations clocks, although it did not distinguish hostile environment claims. *Garg v. Macomb Cty. Cmty. Mental Health Servs.*, 472 Mich. 263, 284 (2005). At least one lower court in Michigan has read *Garg* to mean that no act outside the limitations period can form the basis of a claim but untimely acts "may, in appropriate cases, be used as background evidence to establish a pattern of discrimination." *Campbell v. Dep't of Human Servs.*, 286 Mich. App. 230, 238 (2009). Of course, a claim under ELCRA is untimely when no discriminatory or hostile act occurred within the limitations period. *See Magee*, 472 Mich. at 113.

33

Harwood filed suit on August 17, 2018. (ECF No. 1, Complaint, PgID 25.) Therefore, Harwood's ELCRA claims are contractually limited to acts that occurred on or after February 17, 2018. Her Title VII claims are limited to acts that occurred on or after October 21, 2017, although acts that occurred prior to that day are actionable if they form part of a single hostile work environment claim where at least one act contributing to that claim occurred on or after October 21, 2017. *Cf. Morgan*, 536 U.S. at 120. There is no dispute that Harwood's retaliation claims under both statutes are timely—the alleged retaliatory act, termination, happened on February 20, 2018. (ECF No. 29-5, Greenberg Dep., PgID 1670.) Further, Harwood's ELCRA hostile environment claim is barred by the limitations period in her contract because she does not allege that any acts contributing to the hostile environment happened after February 17, 2018. (*See* ECF No. 35, Response, PgID 1714–16); *cf. Magee*, 472 Mich. at 113. The dispute, then, is over whether Harwood's Title VII hostile environment claim is timely.

The task before the Court is "to determine whether the acts about which [Harwood] complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Morgan*, 536 U.S. at 120. All five incidents of inappropriate workplace conduct—the

34

scantily-clad models, the photo from the holiday party, the trip to the strip club, and the behavior at the executive off-sites in Mexico and St. Maarten—took place before October 21, 2017. So, they cannot form the basis of a hostile environment claim unless they are part of the same hostile work environment practice as the allegations of exclusion and unequal treatment throughout Harwood's entire time at NAB. *Cf. Morgan*, 536 U.S. at 120.

Harwood argues that all of this conduct is part of one "sexually hostile" environment because all of the behavior evinces an anti-female bias. (ECF No. 35, Response, PgID 1713.) Defendants contend that the sexual comments are different from the "facially-neutral business conduct" at issue. (ECF No. 37, Reply, PgID 1766.) It is well established that, in the Sixth Circuit, "*[a]ny* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (referencing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The requirement that the behavior is based on sex can be met by showing "harassing behavior that is either lascivious in nature or that reflects an

'anti-female animus.'" *Wanchik v. Great Lakes Health Plan. Inc.*, 6 F. App'x 252, 263 (6th Cir. Mar. 2, 2001).

Here, Harwood has alleged some lascivious behavior and some behavior that, according to her, reflects an anti-female animus. The analysis of whether the allegations of each type of behavior are sufficiently similar to make up a single claim of hostile environment harassment bleeds into the analysis of whether Harwood has produced sufficient evidence to support any hostile environment claim, and because the Court finds, below, that a reasonable jury could believe that Harwood was subject to a hostile work environment based on her sex, that jury could also believe that all of Harwood's allegations make up one claim and are therefore timely.[4]

### C.    Harassment/Hostile Work Environment

Harassment based on sex that is "sufficiently severe or pervasive to alter the terms and conditions of the victim's employment and create an abusive working environment" is unlawful under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotations and citations omitted); 42 U.S.C. § 2000e-

---

[4] This conclusion does not resolve questions of the admissibility of evidence such as the photo booth picture at trial.

36

2. The conduct must be severe and pervasive enough that a reasonable person would find the environment hostile or abusive, and the victim must subjectively perceive it as hostile or abusive. *Harris*, 510 U.S. at 21.

Courts look to the totality of the circumstances in evaluating the severity of the conduct—including the frequency of the conduct, whether it is physically threatening or merely offensive, and the degree to which it interferes with the employee's work performance. *Id.* at 23. This is so because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81–82 (1998).

In the Sixth Circuit, a prima facie case of harassment based on a hostile work environment requires evidence that the plaintiff (1) is a member of a protected class, (2) was subjected to harassment through words or actions based on sex that (3) had the effect of unreasonably interfering with her work performance, and (4) that there is some basis for liability on the part of the employer. *Gallagher*, 567 F.3d at 270. The third element does not require proof that the plaintiff's

productivity declined, only proof that the harassment made it harder to do the work. *Williams*, 187 F.3d at 567.

The second element is shown by evidence of "harassing behavior that is either lascivious in nature or that reflects an 'anti-female animus.'" *Wanchik*, 6 F. App'x at 263. When conduct is pervasive, explicitly sexual, and patently degrading to women, that conduct creates an inference of anti-female animus even if it is not directed at the plaintiff. *See Williams*, 187 F.3d at 566 (use of gender-specific epithets and comments like "fucking women" created inference). In *Gallagher v. C.H. Robinson Worldwide, Inc.*, the inference was created by allegations that the atmosphere in an open-floor-plan office resembled a "guys' locker room" because male employees called women "bitches, whores, sluts, dykes and cunts," viewed sexually explicit pictures on their computers, left pornographic magazines on their desks, and traded sexual jokes and fantasies. 567 F.3d 263, 267, 271 (6th Cir. 2009). Similarly, in *Wanchik*, the plaintiff's colleagues told lewd jokes, described sexual fantasies, and denigrated other women's bodies in front of her. 6 F. App'x at 260–61. Some even went so far as to fondle and caress other female employees. *Id.* at 261. The Sixth Circuit found that this conduct, even though the plaintiff did not personally experience all of it, was "based on sex." *Id.* at 263.

38

An anti-female animus can also be shown through differential treatment of women compared to men. *See Daniels v. Pike Cty. Comm'rs*, 706 F. App'x 281, 288 (6th Cir. Aug. 29, 2017). In *Daniels*, a county prosecutor treated female employees much differently than male employees:

> [He] checked the search histories on only the women's computers; he stated in front of members of the public that he needed to check on only the women in the office to ensure that they were completing their work; he asked only the female employees if they had clocked in; he expressed gratitude to only the women in the office that they were working and not whining; "oftentimes, instead of addressing [the female employees] directly, he would speak to others about them as if they were not present"; he made unambiguous comments that he didn't like to hire women and that it was easier to work with men than women; and he once popped bubble wrap behind [one of them] because he enjoyed tormenting and upsetting the women and "wanted to see [them] shake or jump."

*Id.* at 288–89. The Sixth Circuit found that, in the aggregate, the prosecutor's behavior raised "at least the specter of anti-female animus." *Id.* at 289. By contrast, behavior toward a single woman motivated by personal dislike does not show anti-female animus. *See Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) ("Personal conflict does not equate with discriminatory animus.") (internal citation omitted).

39

Harwood's hostile work environment claim is based on her allegations of five incidents of inappropriate sexual conduct as well as her assertion that Gardner regularly excluded her from important business conversations with her male peers, and that he regularly requested information on her areas of responsibility from her male peers instead of from her. (ECF No. 35, Response, PgID 1713.) There is no question that Harwood, a woman, is a member of a protected class and Defendants do not contest that NAB would be liable for harassment perpetrated by Gardner, its CEO. Defendants do argue that the second element, harassment based on sex, and the third element, unreasonable interference with work performance, are absent. (ECF No. 26, MSJ, PgID 170–73.) They argue that the conduct at issue was not based on Harwood's gender but was a byproduct of the clash between her and Gardner's managerial styles, and that the conduct was not sufficiently severe and pervasive to alter the conditions of her employment. (*Id.*)

Regarding the requirement the harassing conduct be based on sex, Harwood, as stated above, has alleged some conduct that is "lascivious in nature" and some conduct that she argues "reflects an 'anti-female animus.'" *Wanchik*, 6 F. App'x at 263. When combined, these allegations raise "at least the specter of anti-female animus," *Daniels*, 706 F. App'x 289, and Gardner's comment to Harwood, "if you

weren't a mom you could have," and his response of "maybe" when she asked, "if I was a dad it would be different?" cements that inference because Gardner attributes a business decision to the fact that Harwood is a mom rather than a dad. (ECF No. 29-4, Harwood Dep., PgID 1293.)

The five incidents of lascivious-in-nature conduct—the scantily-clad models in 2014, the photo from the holiday party in 2014, the trip to the strip club in 2014, and the behavior at the executive off-sites in Mexico and St. Maarten in 2015 and 2017, though infrequent, share an important characteristic with the men's locker room atmosphere in *Gallagher*, 567 F.3d at 267, the use of terms like "slut" and "fucking women" in *Williams*, 187 F.3d 565–66, and the lewd jokes, sexual fantasies, denigration of women's bodies, and physical invasion of women's bodies in *Wanchik*, 6 F. App'x at 260–61. That characteristic is the objectification of women's bodies, which, when combined with other evidence of anti-woman bias, as it is here, raises an inference of anti-woman animus.

Further, Gardner's exclusion of Harwood from certain business conversations and his failure to communicate with her as frequently as he did with other members of the executive team is similar to differential treatment of women seen in *Daniels*. 706 F. App'x at 288–89. Though a jury could credit Gardner's

41

contention that his actions toward Harwood were simply due to individual personal conflict, like the conduct in *Morris*, a jury could also believe Harwood's assertion that her interpersonal conflict with Gardner was based, at least in part, on the fact that she is a woman. 201 F.3d at 791. Further, Harwood alleged that Gardner's exclusionary behavior was constant, and that "on nearly every Monday executive meeting" she was informed about decisions made without over the weekend that impacted the entire her company the divisions under her control. (ECF No. 29-4, Harwood Dep., PgID 1433.) This is proof that the harassing behavior made it harder to for Harwood to perform her work, thus changing the terms and conditions of her employment. *Williams*, 187 F.3d at 567.

So, considering all of the alleged behavior together, as is required under the totality-of-the-circumstances inquiry, *see Harris*, 510 U.S. at 23, a reasonable inference of pervasive anti-female animus is available to a jury in this case. Therefore, Harwood has established a prima facie case of sex-based hostile environment discrimination under Title VII. Accordingly, the Court denies Defendants' Motion for Summary Judgment on this claim. (ECF No. 26.)

### D.   Retaliation

Harwood also brought retaliation charges against Gardner and NAB under Title VII and ELCRA. A prima facie case of retaliation requires proof:

> (1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Williams*, 187 F.3d at 568. Once the plaintiff produces evidence showing each element of the prima facie case, the burden of production shifts to the employer to articulate a non-retaliatory reason for the termination. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). If the employer articulates such a reason, the burden of production shifts back to the employee, who bears the burden of persuasion throughout, to show that the employer's reason was pretext. *Id.* at 614. To show pretext, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). The analysis of retaliation claims under ELCRA is identical. *Redlin*, 921 F.3d at 614.

On the first element, protected activity, Harwood has identified both the dBusiness article and her November 27th conversation with Gardner where she

43

demanded that he stop treating her differently as protected activity. (*See* ECF No. 1, Complaint, PgID 17, 23–24, ¶¶ 87, 118 (unclear); ECF No. 1-2, EEOC Charge, PgID 29 (dBusiness article); ECF No. 35, Response, PgID 1706 (November 27th conversation).) Both actions qualify.

Opposing a practice made unlawful by either ELCRA or Title VII by complaining to anyone—a co-worker, a newspaper reporter, or anyone else—is protected activity under both statutes. *See Daniels*, 706 F. App'x at 291–92 (Title VII); *Redlin*, 921 F.3d at 614 (ELCRA follows Title VII on retaliation). The complaint must be more than a vague charge of discrimination, but need not be formal, precise, or absolutely clear. *Daniels*, 706 F. App'x at 292 (finding that complaining about the unequal treatment at work was enough of a complaint to be protected activity). Harwood opposed what she perceived as unlawful gender discrimination when she told the author of the dBusiness article that she was being treated differently because she is a woman and again when she told Gardner that she felt he was treating her differently based on her gender and said that he needed to stop. (ECF No. 26-12, Article, PgID 514; (ECF No. 29-4, Harwood Dep., PgID 1293.) Harwood has established the first element.

The second and third elements are undisputed. Gardner saw the article soon after it came out and had participated in the conversation where she told him to stop treating her differently because she is a woman on November 27, so he knew that Harwood engaged in protected activity. (ECF No. 29-4, Harwood Dep., PgID 1480–81, 1226.) Further, termination is, without a doubt, a materially adverse action (an action likely to dissuade a reasonable worker from making or supporting a charge of discrimination). *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014).

The parties dispute the fourth element, causation. At the prima facie stage, the burden of production is minimal—"all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th. Cir. 2007). Temporal proximity alone can be sufficient to establish the fourth element when the adverse action closely follows the protected activity. *Redlin*, 921 F.3d at 615. Several courts have found that a "two- to three-month time lapse between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018) (lapse of just over two months sufficient on its

own) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 897 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases)). If the lapse in time between the protected conduct and adverse action is longer, more evidence of causation must be produced. *See Redlin*, 921 F.3d at 615 (citing *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 320–21 (6th Cir. 2007) where time lapse of "roughly three months" was insufficient on its own to establish causation).

Other relevant evidence of causation necessarily blends into evidence that disproves the employer's non-retaliatory reason for the adverse action. In *Redlin*, the Sixth Circuit found that employer's reason could be pretextual, thereby finding causation, when the employer attributed the adverse action to employee misconduct but another employee committed the same misconduct but did not suffer the same materially adverse action. *Id.* at 615–16. Conversely, in *Bailey v. Oakwood Healthcare, Inc.*, the Sixth Circuit did not find causation when the termination was several months removed from the protected conduct and the stated reasons for the termination arose after the protected conduct. 732 F. App'x 360, 368 (6th Cir. Apr. 23, 2018).

Here, the significance of the eighty-five day lapse in time between one of the instances of protected conduct, the November 27, 2017 confrontation, and

46

Harwood's February 20, 2018 termination is relevant but likely insufficient on its own to show causation. *Cf. Tuttle*, 474 F.3d at 320–21 (roughly three months insufficient alone). Therefore, it is necessary to consider both Gardner's stated non-retaliatory reason for terminating Harwood and Harwood's evidence refuting that reason. Gardner stated that he terminated Harwood because of conflicts between their management styles and because he believed she was creating too much tension in the C-Suite. (ECF No. 29, Gardner Dep., PgID 665; *see also* ECF No. 26-3, Gardner Decl., PgID 229–230, ¶¶ 18–19.) Harwood argues that she has produced evidence of a pattern of retaliatory conduct starting from the November 27th confrontation because (a) she testified that Gardner ostracized her after that conversation, (b) Gardner testified that he began to consider terminating her in the fourth quarter of 2017, and (c) general counsel Rob Smith emailed her in January asking if she needed to follow up on that conversation, indicating that Gardner felt her charge of discrimination on November 27th was different-in-kind than her previous complaints. (ECF No. 35, Response, PgID 1707–09.)

This is a close question. One the one hand, a jury could look to the fact that Harwood herself acknowledged that her relationship with Gardner, not to mention her relationship with Parkinson, had significantly deteriorated since the summer of

2017, attribute the deterioration to the problems around the TMS acquisition, such as Harwood missing the call and telling Mike Vaughn not to speak to Gardner, and determine that Gardner would have terminated Harwood even if she had not done the interview with dBusiness or confronted him on November 27th. On the other hand, a jury could credit Harwood's account of the deterioration, that her ability to perform her job was regularly undermined by Gardner treating her differently because she is a woman, that the November 27 confrontation was different in kind than her previous requests to receive fair treatment, a conclusion supported by the fact that NAB's general counsel asked her if she required any follow-up from the conversation, and that the confrontation catalyzed Gardner's decision to terminate her. (ECF No. 29-4, Harwood Dep., PgID 1287); *Contra Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008) ("Even assuming that [Plaintiff] established her *prima facie* case by showing a causal connection between her protected activity and her termination, the record contains no evidence to refute the claim that the defendants would still have fired [Plaintiff] for the stated, justifiable reasons.") In other words, Harwood has produced sufficient evidence to create a genuine issue of material fact on the issue of retaliation, under both Title VII and ELCRA. The Court, therefore, denies summary judgment on both claims.

Case 2:18-cv-12567-PDB-EAS   ECF No. 40   filed 04/29/20   PageID.1833   Page 49 of 49

## V.  CONCLUSION

For those reasons, the Court DENIES Defendants' Motion for Summary Judgment (ECF No. 26) to the extent that it seeks judgment on Harwood's Title VII hostile environment and retaliation claims against NAB, and her ELCRA retaliation claim against both NAB and Gardner, and the Court GRANTS Defendants' Motion on the gender discrimination claims under both Title VII and ELCRA, the Title VII claims against Defendant Gardner, and the ELCRA hostile environment claim.

IT IS SO ORDERED.


Dated: April 29, 2020                                    s/Paul D. Borman
                                                         Paul D. Borman
                                                         United States District Judge